Next on our argument calendar is Atticus LLC v. The Dramatic Publishing Company and the Dramatic Publishing Company v. Atticus LLC. Mr. J., my understanding is that you want leave of the court to have four minutes for rebuttal. Is that correct? Since the rebuttal is also the cross-appeal argument, if that's all right. Three minutes would be fine. Four minutes is fine. Thank you, Your Honor. I appreciate that. Okay. Is the court ready? Yes, we sure are. Thank you, Your Honor. William J. for the appellant. We've raised four independent grounds. Speak right up, Mr. J. Pardon? Speak right up. We've raised four independent grounds for reversing the judgment and some more grounds for reversing the award of attorney's fees. Of course, I'll answer anything that the court wants me to address, but I'd like to spend the most of my time on two of those issues, the derivative works exception and then the timing provision governing when terminated rights can be regranted. So I'd like to begin specifically with the derivative works exception and the text of that provision. The text says that it's an exception that applies in all cases to the general rule that rights can be terminated. And once a derivative work is created, it may continue to be utilized in accordance with the terms of the grant. The Supreme Court said in Mill's music that you can't parse among the terms of the grant. It says the terms of the grant, not some of the terms of the grant. And that really is the core of our submission here, that the terms of the grant in this case include the royalty that will be paid, the places where the servile play may be performed, and the reciprocal obligation of the Lee estate not to license a competing play in those places. The exclusivity of it. The Lee estate agrees to give Dramatic the exclusive non-first class rights to perform the servile play. What then was terminated when Ms. Lee issued the termination notice? What aspect of the existing agreement between your clients and Ms. Lee was terminated? Quite a lot. The Lee estate regains most fundamentally the rights over further derivative works. The Lee estate, of course, also- But you contend that you hold an exclusive right to perform only your derivative work and no others. You interpret it to be exclusive. And so therefore a derivative work couldn't be performed on a non-first class production, correct, in the United States? Well, because of the terms of the grant, a non-first class production can't be performed in the United States. That's right, but- But isn't that the nature of the copyright itself? No, not at all. Let me give you a very concrete example. Tell me then what was terminated. So, for example, if Dramatic wanted to make a movie version, a filmed version, of a performance of the servile play, it couldn't do that. The right to create further derivative works has gone back to the Lee estate. Any rights that Dramatic had in the- Oh, okay, so you're saying it retained its exclusivity as to the performance of a play, a derivative work that was a play. So the only part of the bargain that's a term of the grant that's relevant here is that the Lee estate says, in exchange for you paying me royalties each time you license a performance of the servile play, within the radius restrictions and the type of productions, I agree that I will not license- this will be the only play that I will license in these formats. But the Lee estate retained the right to license a Broadway production, a first class production. Now, in understanding why this is not saying that an exclusive license may not be terminated, I think- I'm so sorry. I'm going to ask you to have to lift up the podium. I am straining to hear you. I'm sorry. I want to be able to make sure that I'm focusing on you. They designed this courtroom so we couldn't hear. I think that may be as far up as it goes. Susan, can you- Let me try both microphones. The CSO will help you out. Maybe it's not coming up. Why don't you go ahead and stop the time, Troy? I want to figure this out. What's curious about your answer, Mr. Jay, is that the agreement, the 69 agreement already reserved to the owner, not previously given with regard to professional acting, radio broadcasting, motion picture, etc. So I ask you then again, what was terminated? But I think that's my point, Your Honor, that what we're talking about is the terms of the 1969 agreement. Yeah, I've been reading it. Right, but what's at issue first is the other side's submission that the statute itself means that no terms of the grant that relate to exclusivity or in Atticus's case, they argue that no non-financial terms survive. And so let's take the simplest possible example, an assignment of all the author's rights in a copyright. And then the recipient of that assignment creates a derivative work, a play, a movie, whatever. And maybe they have some exclusivity term, maybe not. But when that right is terminated pursuant to the Copyright Act, all of the rights except the rights in the derivative work go back. So that includes the rights to make copies of the underlying work. It includes the rights to perform the underlying work. Let's say the underlying work is a play and the derivative work is a musical. All of those rights go back to the original copyright owner. The only thing that's preserved by the derivative work exception are the rights to utilize the derivative work. Now, on what terms? The statute just says in accordance with the terms of the grant. And what the Supreme Court said in Mills Music is you don't unpick the terms of the grant and say that some terms are preserved and others are changed because of the exercise of the termination. The termination— But those were commissions and other financial arrangements that were earned as a result of the playing of the songs, right? I mean, that wasn't—it wasn't dealing with an exclusivity provision. It wasn't dealing with exclusivity, but if you look at Note 35, I think that's one of the clearest statements, that it says the terms of the grant and not some of the terms of the grant because it wasn't about what the royalties would be. It was about to whom the royalties would be paid. If the grant was merely a recitation of what copyright law is, then how has that become a matter of contract and not just a matter of understanding the nature of copyright? Well, the statute preserves the right to utilize the derivative work in accordance with the terms of the grant, and it doesn't make that more specific precisely because the derivative— different types of derivative works have different rights associated with them. In terms of the use of the derivative work, but you seek to say that it extends beyond that. It then insulates the derivative work. It doesn't allow any other derivative works to be created because of the exclusivity contained within the original grant. So respectfully, Your Honor, that's not our position, and that is not— that is the caricature that the other side has put forward as our position, but we're not— So the grant—the subsequent grant, notwithstanding the argument that I know you want to make in your second part, but the grant with regard to professional plays or first class— First class. I find that curious, first class versus non-first class, but that's their term. But she couldn't do that. Harper Lee could do that, right? So she reserved the rights to create—to authorize a new first class. But that was separate and independent of the termination, wasn't it? That was separate and independent of the termination. So she didn't need the termination for nothing? No. On the contrary, Your Honor, like the specifics— and remember this agreement, of course, was entered into before the termination right existed. I understand. Right, right. I understand. But the specifics of the rights that she reserved—so, for example, as you said, she reserved the rights to make another movie. Of course, the first movie had already been made. But if she hadn't—if that had been part of the grant, that would have gone back to the Lee estate because we hadn't made the movie. As the Supreme Court said, the dividing line is whether the derivative work has been produced or not as of the time of the termination. So I'm related to that. I'm sorry. Did you— No, go ahead. Part of the thing I'm struggling with is that 304C68 uses the word privilege rather than right. Is that legally significant? I don't think so, Your Honor. The word privilege, I mean, sometimes has been used in legal terms to refer to something that— Well, I guess the reason I ask then is because I'm not sure, based on your conversation with Judge Wesley, then how we distinguish between a separate right and just a term of the grant. So the rights associated with a copyrighted work are those—almost all of them are set out in Section 106 of the Copyright Act. And so for a dramatic work like this, lowercase d, that includes the right to— that would include the right to public performance of the work. But it would also include the right to sell copies and so on. So because the derivative work that we're talking about here is not a song with sound recordings or a movie, it's a play, that just includes the right to sell copies and the right to perform the derivative work. And those are, as it happens, but those are the two provisions for which there are royalty provisions in the agreement, the 1969 agreement. And that is what we're saying are the terms of the grant. The royalty, who those royalties are paid to, where we can perform the derivative work, and in exchange for soaking a higher royalty, the lease— The statute says that even an exclusive agreement is subject to termination. Yes. And that that right is so clear that notwithstanding an agreement to the contrary, it can still be terminated. How do you square your position with that language? I think that supports our position, Your Honor, because— so the statute begins, just as you said, either whether exclusive or non-exclusive. But your position eliminates or nullifies the ability of a copyright owner to terminate an exclusivity. It does not, Your Honor. An exclusive license or grant may be terminated, and all of the rights that aren't those specifically associated with the derivative work and governed by the terms of the grant go back to the copyright owner. And so just to answer your statutory question, the statute begins by saying an exclusive or non-exclusive grant is subject to termination. True. But then if you look down at the beginning of C-6, in all cases, all cases, which means kind of a fortiori exclusive or non-exclusive, the perversion of rights is subject to the following limitations. The first of those limitations is the derivative work exception. And so if I leave the Court with nothing else today— But if the derivative work exception includes the right to exclusivity, it does seem to undermine the point of the whole thing. But it's not an unlimited right to exclusivity, Your Honor. So it relates only to the derivative work. It doesn't relate to the making of new derivative works, and it's only if that is one of the terms of the grant. So if there's just a naked grant that says you may make a derivative work, there's nothing about—no exclusivity promise. But if Ms. Lee had just given your clients the right to prepare work, that didn't give them the protections of copyright. It just gave them the right to prepare work. I suppose then they might try to copyright it themselves, and then they've got all kinds of difficulties. But she gave them more than that. She gave them the right to use—to kill a mockingbird. And so, I mean, she gave them the protections of her copyright. And her copyright had exclusivity to it. I mean, my problem I have with your argument is that I don't see how you're not mimicking exactly what the statute seems to— I mean, Judge Shinseides is—perhaps is struggling with it too. I don't know how you can say contractually you cannot do what Congress said she could do, which was take away your exclusivity. So what Congress said is that the derivative work— a derivative work, which can be copyrighted on its own, but—which is derivative of her work, that it may continue to be utilized in accordance with the terms of the grant. And just as you asked me about— What Congress said was that she could terminate your exclusivity, but that—excuse me— but that you could continue nonetheless to use your derivative work in any derivative works that were derivative of yours. You were entitled to protection. No. That's not what they said? No. If I disagree with you, do you lose? I don't think so, because I think you're actually suggesting that we're claiming more than we are. I am. We're not claiming that we have the rights to derivative works of the servile play. Any such right would be—would have gone back to the Lee estate, the right to authorize further derivative works. I think that's the answer to the question that both you and Judge Shin have asked. What did the Lee estate get back? One of the things that the Lee estate gets back is control over the authorization of the creation of further derivative works. I agree with you on that. I mentioned—what I was saying to you was words that are derivative of yours. So during the copyright—during the life of the copyright, of Harper Lee's copyright in the—in To Kill a Mockingbird, we don't have the right under this agreement to create further derivative works. Okay. So nothing in the statute—like, that's one of the key things in the derivative works exception, that our privilege or right under the—under A does not extend to the creation of further derivative works. Now, all of this is a baseline, and I see that I'm well over my time. Could we move to the second part of his argument? Sure. Thank you, Your Honor. So I'll touch on that very briefly. I won't tax the Court's patience. But on the timing provision, which governs when a copyright owner that has exercised the right to terminate may regrant those rights. I mean, I think that the dates here are undisputed, and what we have here is an agreement to make a further grant, and as this Court has said, I think, multiple times, that that grant is invalid if it's made too early, because it's during the time when Dramatic has what the legislative history calls the right of first refusal to negotiate about what's going to happen with the rights once they are restored to the copyright owner. That's exactly why the Copyright Act requires advance notice before termination can be effected. During that notice period, before the termination date arrives— Does it matter that it was dependent upon Ms. Lee's approval of the playwright? I don't think so, Your Honor, because ultimately it's an agreement to make a future grant. The statute is written quite broadly, so that, sure, there are going to be conditions— So even that kind of agreement, you say, falls within the prohibition? It does. I mean, that's not the decision of the other side. I don't want to call it prohibition limitation, I guess is what you mean. Yeah. I mean, it says that to be valid, an agreement to make a further grant must be made after the effective date of the termination. So I think it's a condition of validity. And the other side has made a distinct argument from the one that Your Honor just asked me about. They've said that the agreement didn't become effective until the Sorkin play premiered on Broadway. That can't be right. No, it can't be right. You'll get time on rebuttal. Thank you, Your Honor. Thank you.  Whenever everyone's ready. May it please the Court, Joshua Santos on behalf of the United States. The government is participating here only to address the proper interpretation of the termination provisions and the derivative worth limitation, because the interpretation put forward by the appellant here we think can have very far-reaching consequences with some logical consequences that we outlined in our brief. So I'll just jump right to interpreting, to applying the language of the termination provisions and limitation here. When Harper Lee wrote To Kill a Mockingbird and got her copyright, one of the rights in Section 106 was the right to prepare or authorize derivative works based on To Kill a Mockingbird. She gave a grant to Dramatic to prepare a play only for performance in certain kinds of productions. And in 1978, Congress says we want to give authors second chance. I think you need to jump. You've only got four minutes. We'll jump to the language. So the language of the statute says upon termination, all of the rights in Section 106 will revert to the author. Then there's a limitation. So can you tell me, do you think that exclusivity is governed by the words utilize, by the word term, where, or both where? Like where do we see how we interpret and understand the exclusivity aspect of this? So exclusivity is part of the copyright in To Kill a Mockingbird. It's listed in 106. Now, how we apply the derivative work limitation, which I think is Your Honor's question, like how does it relate to exclusivity? I think what you look at is the language that says the only thing that's covered by this limitation is a privilege, and it's what for? It's that the derivative work that exists may continue to be utilized under the terms of the grant. Like what does that mean? What is Congress saying concretely here? Well, it's a play. You can keep performing the play. You can publish it in anthologies, that kind of thing, right? You can use it without fear of being sued for infringement. Under the terms of the grant, which terms? Well, the terms about if you publish it in anthology, it has to be within a certain word limit. If you perform it, it has to be only in non-first-class productions. It can only be in certain geographic areas depending on certain factors. Those are all the terms of use, right? There's royalties, that kind of thing. What Appellant is saying is, well, exclusivity is a term of use. Exclusivity is not about how they use their play. Exclusivity is a right in new derivative works based on To Kill a Mockingbird. That was a right that Harper Lee got in 1960. Long before this derivative work existed, it is a right that existed even if no derivative work had existed. Can you just draw a line between what is a term of the grant under 304C6A and what is not? Well, so — Because you're saying exclusively is not. It's not. So it's not just term of the grant, remember. It's utilized under the terms of the grant. So obviously what Congress is saying is the copyright is still terminated. You can see that in the derivative work limitation. It still talks about the terminated grant. It refers to termination like four times. So Congress still thought it was terminated. Which grants are still part of this privilege? It's those for utilizing, for using their play, which does not entail them excluding other people who wrote other plays based on To Kill a Mockingbird from these productions. The fact that it says a derivative work prepared under the authority of the grant before its termination may continue to be utilized. It's a utilization of the grant. In other words, the work itself. The work itself. And so we distinguish that between the utilization of the work, the derivative work, payment of royalties, et cetera, as opposed to the exclusivity of the grant, which is in the nature of the underlying rights of copyright. Is that it? Yes. That's exactly right. And there are several reasons for this beyond just the fact that utilization, I think, in context is going to be referring to performance or distributing or printing, that kind of thing. But one is that exclusivity really is the heart of the copyright in To Kill a Mockingbird. It is one of the rights listed in Section 106 that Harper Lee had. So it's not about using a derivative work. There's also the second clause of this limitation, right, which says that the privilege that's listed in this limitation does not extend to the preparation of derivative works after the termination. I mean, that makes perfect sense if Congress is thinking the author gets back the right to make new derivative works based on their work. It does not make sense if the grantee with an exclusive grant, which, by the way, they're very common, right, if the grantee gets to then still preclude new derivative works. Because at that point, neither the author nor the prior grantee can make any new plays based on To Kill a Mockingbird here, right, for example. So the statute recognizes that the reach of the termination goes to the, quote, privilege, and that that privilege does not extend to the preparation of termination of other derivative works, correct? That's right. So other derivative works by their very nature can occur after termination in accordance with the statute, notwithstanding the nature of the grant of exclusivity in the original agreement. Right. That's exactly right. That is what we're explaining here today. Because, I mean, otherwise you have this, the consequences that I just referred to where no new works could be made. Someone else could come along, write a new play, a new derivative work, and that would not violate DRAMATIC's continuing right to utilize its derivative work. That's right. That's the position. Yeah. So because what the privilege is, what Congress is trying to prevent is the author, they get back their rights, but they can't turn around and sue someone for infringement just because they're continuing to use the derivative work they made in reliance on the grant. So if you made a movie, if you made a play, a translation, the author can't come around and sue you, right? So this is just saying you can keep using that work, right? But everything else goes back to the author. I see that my time has expired. If there are any further questions. Thank you. Thank you very much. Good morning, Your Honors. Wilk Wong of Sheppard & Mullin for Appellate and Cross Appellant Advocates. Your Honors, I think I can address several of the questions that have come up today by simplifying the sort of framework we're working with. Judge Perez, you asked earlier what distinguishes exclusive rights from the other terms of the grant that continue to survive under the derivative work exception. And the key issue is that exclusivity is a form of copyright ownership. Dramatic acknowledges to this in their own opening brief on page 47 where they say a dispute over exclusivity is a dispute about copyright ownership because an exclusive license is effectively a transfer of ownership over the rights licensed. Now, that comes directly from the statutory language of the Copyright Act. If you look at Section 101, the definition of transfer of copyright ownership includes an exclusive license or any other conveyance of any of the exclusive rights comprised in a copyright but not including a non-exclusive license. So this distinction between ownership and any other terms, monetary or otherwise, in the terms of the grant, pursuant to which a derivative work created under the authority of the grant can continue to be utilized, that's the key distinction that needs to be made here. So what you're left with when you look at the statutory framework, there's no ambiguity here or contradiction. Termination results in a reversion of copyright ownership and thus exclusivity to the author or his or her heirs. And the derivative works exception permits the utilization of a derivative work prepared under the authority of the grant but does not maintain or continue any right to prevent others from utilizing the original work. What would you do about the argument your colleague mentioned about the fact that they would be limited in how they used further derivative works of their derivation, that that was rights that went back to Ms. Lee? How would you respond to that under your framework? And I believe that was Judge Weston's question. The fact of the matter is, Dramatic's core position is that all of the terms of the grant survive. No, but you answered the question under your framework, would they be allowed to do further derivative work of their own? No, Your Honor, they wouldn't. They would or would not? They would not. And why is that? Well, the critical point is the original license never gave them that right to begin with. They had the right to create one derivative work for purposes of staging non-first class amateur stock productions. So they had the right to create the circle play and no other right. So who has the right to do more if she retains it? Well, according to Dramatic's theory, nobody. No, no, no. You're trying to get us to have a framework. Please don't characterize what they're saying. I'm trying to understand. So you've already said that they do not have a right to do further derivations of their own right of their own prelate that they own. Correct. Who has the right to do further derivations of their? That would be the Lee estate, Your Honor, pursuant to the 2015 agreement that was granted to Atticus's predecessor, now Atticus. So under the framework of the Copyright Act, you are absolutely right, Judge Perez. It's Pettis also. My apologies, Judge Pettis. But if I'm understanding your inference properly, under the Copyright Act, that right reverts to the heirs of Harper Lee. Now, this distinction I was making earlier between exclusivity and any other terms of the grant, that comes straight from Mill's music as well. Bear with me for one second. So consistent with the statutory language in Mill's music, of course, the court held that termination didn't even hold this. It was a casual observation because it's so fundamental to the concept of termination to begin with. But the court observed that termination causes the ownership of the underlying copyright to revert to the author or the statutory heirs. And what the court ultimately held in Mill's is that the royalty framework from that licensing arrangement continues in connection with the further utilization of the derivative work post-termination. And there's a quote on page 174 of the decision that underscores the limitations of that holding. It's not that all terms of the grant survive. I'm quoting here. The terms of the grant as existing at the time of termination govern the author's right to receive royalties. Those terms are therefore excluded from the bundle of rights that the author may seek to resell unimpeded by any ill-advised prior commitment. In other words, the bundle of rights that revert upon termination. The statutory distinction between the rights that revert to the author and those that do not revert is based on the character of the right. So that's the critical distinction. What's the character of the right? Is it a grant of the exclusive rights set forth in 17 U.S.C. 106, the exclusive rights that constitute this bundle of rights that is the copyright? With respect to exclusivity, again, the statutory language makes that clear. That is copyright ownership. There is a panoply of authority, an insurmountable wall of uniform authority that copyright ownership reverts upon termination. That is its fundamental purpose. So you put all of that together, and these are simple logical steps. Exclusivity is absolutely the core of what is terminated, has to be the core of what's terminated upon a valid termination. The validity of the termination that Harper Lee served is not in question in this case. Dramatic's contrary position that all terms of the grant survive necessarily entails continuing exclusivity. They couldn't answer your question, Judge Wesley, as to what rights reverted to the Lee State. They pointed out film rights. They pointed out the right to freedom. Well, and then the right that you conceded, which is the right for them for further derivatives of their derivative. Well, if I understand you're correct, you're— No, I mean, I'm trying to recast what you told me. Like, I thought you said that they would be prohibited from doing derivative works of the derivative product that they already own. Oh. And then that would go back—and I thought you conceded that that would go back to Ms. Lee's estate as well. That would go back to the Lee Estate under the proper interpretation of the Copyright Act, not under Dramatic's interpretation. So according to them, if they had exclusive rights to stage non-first-class productions, yes, the Lee Estate could create— Ward's licensee could create a new derivative work, but they could not stage a non-first-class production. They couldn't use it. And if you expand it out, this principle that all terms of the grant, including exclusivity, survive termination, then if you just take a blanket exclusive license in this— I kind of have a hard time understanding what was terminated because exclusivity is the cornerstone of the copyright, of what makes copyright valuable, right? That's correct, Your Honor. It's the core of copyright ownership, and if that's not terminated, then nothing is. The examples they gave you, Judge Wesley, earlier—this was my point earlier—of what it was actually—what actually reverted to the Lee Estate if exclusivity wasn't terminated. Nothing was terminated. Well, the Lee Estate—the Lee Estate's termination letter didn't terminate rights that they never had. I mean the Lee Estate could still copyright a Broadway show. Correct, Your Honor. A Broadway show. But then—so if anything that was—if any assertion that that was terminated is irrelevant, I mean it just doesn't make sense. The question is what did they own? What did they get from the contract, and what did Congress take away from them by this termination provision of 306, right? Correct, Your Honor, and I appreciate that you stated it much more succinctly and correctly. You haven't argued about the arbitration, the contrary arbitration. But we'll have to deal with that. What's happening in the Seventh Circuit? My understanding is that that appeal—of course, my adversary can correct me. They're much more familiar with it than I am. But my understanding is that appeal has been stayed, but as to the privilege— Stayed for? I think there were discussions ongoing, Your Honor, with respect to— We'll ask your adversary. I think it's better directed to him, Your Honor. What about attorney's fees? I mean is their position—your position is that their position is unreasonable, and we do seem to be at least struggling a bit with it. And they have the arbitration award. I mean why should we hold that their position is unreasonable in light of all of this? Well, I think, Your Honor, there are two aspects to that question. One is the unreasonableness, and I think that's sort of a merits-related question. And the question—and the second question is whether that unreasonableness was objective or whether they could rely upon their own subjective views of the merits to claim that it was objectively reasonable. Well, it's still objective that an arbitrator ruled in their favor. I mean that's an objective fact, putting aside the merits of what's right or wrong. Well, certainly, Your Honor, that's just a fact, and we're not disputing that. But I think when you compare that—when you put that single arbitral award, which has no persuasive authority whatsoever before this Court or any court in the United States, including the SDNY where this was pending, up against this tsunami of authority that for the basic proposition that copyright ownership and therefore exclusivity revert upon termination, it doesn't— So they couldn't very well in this litigation concede that the arbitrator got it wrong, right? Well, they absolutely could have if they were reasonable, Your Honor. That's our position. I mean certainly it's not in their interest to concede that position, but of course any position that a litigant takes in any case, it may not serve them, but it could still be objectively unreasonable if— And the objective unreasonableness is not overcome merely because it's in the litigant's self-interest. The fact that the arbitral award has no persuasive authority, I think if you put it into a hypothetical of could anybody else have relied upon this arbitral award to claim that this meritless position was objectively reasonable, the easy answer would be no. And then you turn to the inquiry of was that unreasonableness in this case subjective or objective? And Dramatic points out in their papers, or they argue in their papers at one point, that the same legal argument certainly can be objectively unreasonable— I'm sorry, objectively reasonable for one litigant and not for another. But that's the very definition of subjective. If you look at Black's Law Dictionary, subjective is defined as personal, individual. So was it reasonable for them to look out for their self-interest? That's a different question than was this an objectively reasonable position under the law and the facts of this case, under the governing law. The fact that it may have been in their interest and they had the single arbitral award that contradicted this mountain of authority that we've cited does not clear that path to objective reasonableness, Your Honor. That's our position. Okay, so unless my colleagues have more questions. No, thank you. Well, thank you. Thank you, Your Honors. So what's happening in the Seventh Circuit? That appeal is still pending mediation. Mediation? They are not waiting for this Court, if that's the question. You sure? It sure does feel like they are, Mr. Jay. Go ahead. Thank you, Your Honor. I'm sorry. So a number of the questions both to the government and to Mr. Huang and a number of the things that they said really depend on understanding our position correctly. We are not saying, and it is not our position, that we have the exclusive right over the preparation of new derivative works. That's not our position. Of new? Of new derivative works. The consequence that our friend from the government voiced is that no new derivative works can be made. Someone else can come along and be licensed to do another play based on the book without violating your client's rights? Well, yes, the Sorkin play is licensed. So what are you claiming by exclusivity? What we're claiming is the terms of the grant are the following. We are allowed to perform the Circle play. We are to pay royalties at the same rate that we pay overseas where we do have the exclusive rights. We are to stay out of the geographies that would interfere with a first-class production. So that's 82 cities that we have to stay out of when there's a Broadway production or a first-class production being mounted. And in exchange, where we have exclusivity, the exclusive non-first-class rights, the Lee estate isn't going to authorize another play to be put on. That doesn't mean that another derivative work can't be. That's answering – that's inconsistent with your first answer. You're saying that the estate cannot license someone else to come along and do an amateur production, a play for an amateur production. I'm having trouble seeing what the difference between what you're saying. That is what we're saying, but that's not the sort of parade of horribles that the government and the other side claim our position is. They're saying that we're not – that our position would not allow the creation of any new derivative works. That's just not correct, nor would that be correct. So they can just create it. They just can't put it on. Is that what you're saying? I mean, we're not trying to be cute. We're actually just trying to understand. No, I think in this case, they couldn't put it on under terms that would violate the terms of the grant. So they could create new ones. They could put it on Broadway. They could create new ones. They could hold it for however long. They could create a movie, something that doesn't compete. Right. Okay. That's exactly right. And all of this turns on, I think, the fact – and Judge Wesley, your question's got at this. The grant from Harper Lee to Germatic was a relatively narrow one. Like, in other words, this grant reserved a lot of rights, whereas, like, a lot of grants that are – the sort of heartland of the type of contract that this statute is getting at are just absolute assignments. You know, I'm signing away all of my rights. And when you sign away all of your rights under the termination provision, you get them all back except as to derivative works. So that's very important. And we're trying – we want to make sure we fully understand you, Mr. Jay. What aspect of your opponent's position impinges upon your understanding of your rights under the original 69 agreement and or its recognition of its continuing effect notwithstanding the termination? Only this. So not, for example, putting the Sorkin play on Broadway. Only licensing the Sorkin play to be performed in non-first-class venues where – So if the Geneseo players, community players, decides to do – to kill a mockingbird, they cannot do the Sorkin play. So if I can just modify that a little bit, the Lee estate can't license them to do the Sorkin play. Okay. That's right. And that's just a consequence of the bargain. And on the question about – So the Sorkin play is okay as a derivative. It's just a question of where it can be performed. In the United States. In the United States, exactly. And the term utilization came up a number of times, and this is where this gets to that. Mill's music is a case, as you mentioned in the top half of the argument, Judge Wesley, it is nominally about royalties, but it's really about who the royalties are paid to. It's a question about middlemen. And so if you thought that the only terms of the grant that count are the ones that govern where the work is actually going to be performed or things like that, that wouldn't explain the holding of Mill's music. The entire structure of Mill's music was there's the creator, there's the music publisher who's the middleman, and then there are the recording companies. And so you could take out the music publisher without having any effect on where the songs could be performed, but the Supreme Court said we're not going to do that. We're not going to unpick any of the terms of the grant because it's the terms of the grant and not some of them. So you're saying that the function of where it's performed is not a function of the exclusivity. It's more in terms of the utilization of the grant. I think that's exactly right because for the same reason that the royalties are. So you see that as more akin to the royalties as opposed to the creation itself of the work and where the work can be performed. The nuts and bolts of the use of the grant. I agree with that mostly. I think that the royalties, where they can be performed and what works will compete with them, those are all part and parcel of the deal. The reason that there's a 25 percent royalty is because of the exclusivity that goes along with it. I apologize to the Senate chair for asking this because your light's on, but I mean obviously we're very interested in this and it's a bit involved. If the Lee estate or its representatives wish to license an additional derivative play to be performed on Broadway, set aside what Atticus owns. It's your position that the terms of your grant would not prohibit that. Exactly. That would be between the Lee estate and Atticus, but the terms of our grant would not prohibit that. In other words, I don't know whether Atticus would say the Lee estate can't do that, but we would not because. That's for another day. Right. For another day. Right. And I appreciate the court saying that these are interesting and hard issues. I hope that they're interesting and hard enough that our position is at least reasonable enough that the court will recognize that the district court erred by granting attorneys fees. Thank you so much for your time. Well, well briefed. Thank you very much to the government and nicely argued, gentlemen. Thank you. Thank you.